Filed 11/30/18

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION EIGHT

| | |
|---|---|
| DAVID KAANAANA et al., | B276420, B279838 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC496090) |
| v. | |
| BARRETT BUSINESS SERVICES, INC., et al, | |
| Defendants and Respondents. | |

APPEALS from a judgment and a postjudgment order of the Superior Court of Los Angeles County.  John Shepard Wiley, Jr., Judge.  Reversed in part, vacated in part and remanded with directions.

Hayes Pawlenko, Matthew B. Hayes and Kye D. Pawlenko for Plaintiffs and Appellants.

Hinshaw & Culbertson, Frederick J. Ufkes and Filomena E. Meyer for Defendants and Respondents.

———————————————

**SUMMARY**

These are appeals from a judgment and a postjudgment attorney fee order in a class action alleging Labor Code violations. The case presents two principal issues. The first is whether plaintiffs should have been paid the prevailing wage applicable to workers employed on public works. The second is the applicable remedy when an employer violates statutory and regulatory provisions requiring employers to provide workers with a duty-free 30-minute meal period, by shortening the meal period by three to five minutes. On the second issue, there is no dispute that plaintiffs are entitled to the statutory remedy under Labor Code section 226.7 – an additional hour of pay at their regular rate.[1] But plaintiffs contend they are also entitled to payment of the minimum wage for the entire 30-minute meal period, while defendants contend they are entitled to nothing more than the section 226.7 remedy.

The trial court found (1) the prevailing wage law did not apply to plaintiffs; and (2) the section 226.7 remedy was the exclusive remedy for the shortened meal period. We disagree with both conclusions and hold:

First, the prevailing wage law applies; under well-established principles of statutory interpretation, plaintiffs were engaged in "public work" within the meaning of the Labor Code. The amount of back pay to which plaintiffs are entitled for the prevailing wage law violation, and whether they are entitled to additional damages arising from the breach, are matters left to the trial court in the first instance on remand.

---

[1] Further statutory references are to the Labor Code unless otherwise specified.

Second, the remedy for defendants' improper shortening of plaintiffs' meal periods consists of (1) one additional hour of pay for every shortened meal period (so-called "premium pay"), as provided under section 226.7, and also (2) payment of wages for actual time worked during the shortened meal period. Plaintiffs are not entitled to be compensated for that part of the meal period time during which they were free from employer control.

Because plaintiffs were entitled to payment of minimum wages for actual time they were required to work during their meal periods, defendants may be subject to the "waiting time penalties" that apply when an employer willfully fails to pay any wages of an employee who is discharged or quits (§ 203, subd. (a)). In addition, defendants are subject to civil penalties under section 1197.1 for payment of wages less than the legal minimum.

Finally, because the case must be remanded to recalculate plaintiffs' recovery, we will not consider plaintiffs' claims of error in the attorney fee award, as that award is vacated to permit the trial court to reconsider attorney fees following remand.

## FACTS AND PROCEDURAL BACKGROUND

Plaintiffs sued defendant Barrett Business Services, Inc., a company providing staffing and management services. Defendant provided employees for two publicly owned and operated recycling facilities under contracts with Los Angeles County Sanitation Districts. The class consisted of "belt sorters" employed by defendant at those facilities between April 15, 2011, and September 30, 2013. Plaintiffs alleged failure to pay minimum wages, overtime, and all wages owing at termination (all based at least in part on alleged noncompliance with the prevailing wage law); failure to provide meal periods; unfair

competition; and civil penalties under sections 558, 1197.1 and 2698 (PAGA, the Private Attorneys General Act of 2004).[2]

Defendant brought a motion to strike the prevailing wage claims, contending it was not required to pay the prevailing wage as a matter of law. The trial court granted the motion in January 2016, concluding the work plaintiffs performed sorting recyclables did not come within the definition of "public works" under the prevailing wage law.

Thereafter, the parties stipulated to certain facts, and to the admissibility and authenticity of certain evidence, for purposes of trial on plaintiffs' other claims. Central to these claims was defendant's policy of requiring belt sorters to return to their stations at the conveyor belt before the end of their 30-minute meal break. The stipulated facts included, in addition to points already mentioned, the following.

The class members are all former employees of defendant. The belt sorters stood at sorting stations along a conveyor belt, removing recyclable materials from the conveyor belt and placing them in receptacles at their sorting stations.

The lead belt sorters would turn the belt off for meal breaks, and the belt sorters were required to clock out for meal breaks, which they all took together. The lead belt sorter was responsible for rounding up the belt sorters to clock back in after

---

[2]     Plaintiffs also alleged a representative claim under PAGA for civil penalties against Michael Alvarez, defendant's onsite manager. The trial court held Mr. Alvarez jointly and severally liable for the penalties awarded against defendant. We use the singular "defendant" throughout for convenience.

meal breaks. Plaintiffs were paid a base hourly rate between $8.25 and $10.75 during the class period.

The parties further stipulated that deposition testimony could be substituted for live testimony for any witness, and the deposition transcripts were deemed authentic. Only one witness presented live testimony at the trial: plaintiffs' expert witness on damages, who was cross-examined by defendant. The parties filed pretrial and posttrial briefs, and the court heard oral arguments after the posttrial briefing.

Plaintiffs asserted two theories of recovery on the wage and hour violations, both based on the meal period defendant provided. The first was that defendant failed to provide at least 30 minutes of duty-free time during meal periods, requiring plaintiffs to return to the conveyor belt (which was turned off for just 30 minutes during meal periods) three to five minutes before it restarted. This made defendant liable under section 226.7 for meal period premiums (one additional hour of pay) for each workday that a full 30-minute meal period was not provided. The amount claimed was $227,190.73.

Plaintiffs' second theory of recovery was that, by not counting the improperly shortened meal periods as "time worked," defendant did not pay plaintiffs "the legal minimum wage" under section 1194.[3] That is, the "truncated meal periods

_____

[3] Section 1194, subdivision (a) provides: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."

should have been considered an 'on-duty meal period,' . . . and the belt sorters should have been paid at least the minimum wage for this time." Plaintiffs asserted this theory of recovery was "separate and distinct from the right to recover a meal period premium" under section 226.7. According to plaintiffs, each class member could recover 30 minutes of pay at the minimum wage for each shortened meal period, plus interest, as well as liquidated damages in the same amount under section 1194.2.[4] The amount claimed was $216,486.92.

In addition, plaintiffs contended they were entitled to "waiting time penalties" that apply when an employer willfully fails to pay "any wages of an employee who is discharged or who quits." (§ 203, subd. (a).)[5] (This claim was based both on failure to pay the meal period premium pay and on failure to pay the minimum wage for the meal periods that were improperly shortened.) The amount claimed was $377,599.20.

---

[4] Section 1194.2, subdivision (a) provides: "In any action under Section . . . 1194, or 1197.1 to recover wages because of the payment of a wage less than the minimum wage fixed by an order of the [Industrial Welfare Commission] or by statute, an employee shall be entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon."

[5] Under section 203, subdivision (a), "[i]f an employer willfully fails to pay, without abatement or reduction, . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

Finally, plaintiffs sought civil penalties under PAGA, which allows a representative action to recover civil penalties for violations of the Labor Code.  (§ 2699.)  Plaintiffs sought these penalties under section 558 (for meal period violations)[6] and section 1197.1 (for minimum wage violations).[7]  The amount claimed was $1,390,800.

---

[6]     Section 558 states that "[a]ny employer or other person acting on behalf of an employer who violates, or causes to be violated, a section of this chapter or any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a civil penalty . . . ."  (*Id.,* subd. (a).)  "[T]his chapter" includes section 512, subdivision (a), which (as relevant here) requires "a meal period of not less than 30 minutes."  The penalties to which the employer or other person "shall be subject" are, for "any initial violation," $50 "for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages," and, "[f]or each subsequent violation," $100 "for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages."  (*Id.,* subd. (a)(1)&(2).)  These penalties are "in addition to any other civil or criminal penalty provided by law."  (*Id.,* subd. (d).)

[7]     Section 1197.1 states:  "Any employer or other person acting either individually or as an officer, agent, or employee of another person, who pays or causes to be paid to any employee a wage less than the minimum fixed by an applicable state or local law, or by an order of the [Industrial Welfare Commission] shall be subject to a civil penalty, restitution of wages, liquidated damages payable to the employee, and any applicable penalties imposed pursuant to Section 203 . . . ."  (*Id.,* subd. (a).)  The penalties specified are:  "For any initial violation that is intentionally committed," $100 "for each underpaid employee for

Defendant contended that even if the court found plaintiffs were not provided a full 30-minute meal period, "the imposition on their time" was de minimis and therefore noncompensable. If the court were to find a remedy was justified, defendant argued, the "sole and exclusive" remedy was the additional hour of pay under section 226.7, and "no other remedies or penalties are legally or factually appropriate."

The trial court's verdict was as follows:

The evidence established that employees lost three to five minutes of a 30-minute break. The court awarded $227,190.73 "for the 22,220 instances in which the unrounded time records reflect breaks of less than 30 minutes."

"[F]or the employees who lost three to five minutes of a 30 minute break, they are not entitled to recover minimum wages for all or any portion of the meal period. Their exclusive remedy is a meal period premium under Labor Code section 226.7."

No waiting time penalties applied, because no minimum wages were owed for the shortened meal periods "and the meal

---

each pay period for which the employee is underpaid." (*Id.*, subd. (a)(1).) "For each subsequent violation for the same specific offense," the penalty is $250 "for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed." (*Id.*, subd. (a)(2).) In both cases, these amounts are "in addition to an amount sufficient to recover underpaid wages, liquidated damages pursuant to Section 1194.2, and any applicable penalties imposed pursuant to Section 203." (*Id.*, subd. (a)(1)&(2).) The civil penalties "are in addition to any other penalty provided by law." (*Id.*, subd. (i).)

8

period premiums that are owing for the shortened meal periods are not a wage that could trigger waiting time penalties."[8]

The court awarded the class $53,293.50 in civil penalties under PAGA. Plaintiffs sought civil penalties under section 558 for noncompliant meal periods totaling $409,950, but the court exercised its discretion to reduce the penalties to 13 percent of the full amount. (On average, plaintiffs were deprived of 13 percent of the 30-minute meal period.) The court found the full penalty would be "unjust, arbitrary and oppressive, or confiscatory" under section 2699, subdivision (e)(2). No civil penalties were owing under section 1197.1 for unpaid minimum wages.

Plaintiffs filed a timely notice of appeal.

Plaintiffs then sought attorney fees under PAGA and Code of Civil Procedure section 1021.5 of $1,095,140. The trial court awarded fees of $109,514, and plaintiffs appealed.[9]

We ordered the two appeals consolidated for purposes of oral argument and decision.[10]

---

[8] The judgment also stated that plaintiffs' cause of action for unfair business practices was "entirely derivative" of the minimum wage and meal period claims, and referred to the court's rulings on those claims.

[9] On January 12, 2018, defendant filed a motion to augment the record in the attorney fee appeal, to include the opposition defendant filed in the trial court to plaintiffs' attorney fee motion. Augmentation is appropriate, but unnecessary in light of our remand to the trial court.

[10] As of the time the case was argued to this court, we had also consolidated a related case, *Canterberry v. Geneva Staffing, Inc.*, B270614. After oral argument, the parties settled the

# DISCUSSION

## 1.    *The prevailing wage claim*

### a.    *Overview of prevailing wage law*

Plaintiffs argue that performing recycling sorting work pursuant to defendant's contract with County Sanitation Districts constitutes "public work," which entitles them to payment of a prevailing wage.  The trial court concluded the work was not "public work," because it was not in the nature of construction work.  We disagree with this narrow construction of "public work."

The prevailing wage law provides that, "[e]xcept for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workers employed on public works."  (§ 1771.)  The section "is applicable only to work performed under contract, and is not applicable to work carried out by a public agency with its own forces."  (*Ibid.*)

The sole prevailing wage law issue presented by these appeals is whether plaintiffs' work, consisting of the belt sorting of recyclables at recycling facilities owned by Los Angeles County Sanitation Districts, constitutes "public work."  This is a question of law subject to our independent judgment.  (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949.)

A definition of "public works" is provided by section 1720.  Subdivision (a) states that " 'public works' means:" and then

_____

*Canterberry* litigation.  Accordingly, we address only the arguments raised in the *Kaanaana* appeals.

itemizes eight different activities that constitute public works. While some of these activities are quite specific, such as "[t]he laying of carpet in a public building done under contract and paid for in whole or in part out of public funds" (§ 1720, subd. (a)(5)), others are more general. We are concerned with the first two general such subdivisions, (a)(1) and (a)(2).

Section 1720, subdivision (a)(1) defines as public works, "Construction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds. . . ." There is no dispute that the recyclable sorting work at issue in this case does not fit within the subdivision (a)(1) definition.

Section 1720, subdivision (a)(2) also defines as public works, "Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. 'Public work' does not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages." As the recyclable sorting work here was, in fact, done for a county sanitation district, it appears that the work at issue falls within the plain language of the first sentence of subdivision (a)(2), and defendant does not seriously contend otherwise.[11] Instead, defendant argues that subdivision (a)(2) cannot be read in isolation, but

_____

[11] As we will discuss later, defendant briefly suggests the "operation" exception of the second sentence of subdivision (a)(2) applies. The defendant in the now-dismissed *Canterberry* appeal had argued that a county sanitation district is not an "other district[] of this type," within the meaning of section 1720, subdivision (a)(2), but the defendant in the remaining *Kaanaana* appeals does not pursue this argument.

11

instead must be read to be limited to construction work, and other work of the types expressly identified in subdivision (a)(1).

b. *Analysis*

### i. Introduction

Preliminarily, we note that the structure of section 1720 does not support the interpretation offered by defendant. Subdivision (a) of the section has eight separate subdivisions, several of which are not, in any way, construction work.[12]

---

[12] Section 1720, subdivision (a) provides, in pertinent part: "(a) As used in this chapter, 'public works' means:

"(1) Construction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority. For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction, including, but not limited to, inspection and land surveying work, and work performed during the postconstruction phases of construction, including, but not limited to, all cleanup work at the jobsite. For purposes of this paragraph, 'installation' includes, but is not limited to, the assembly and disassembly of freestanding and affixed modular office systems.

"(2) Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. 'Public work' does not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages.

"(3) Street, sewer, or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not.

Defendant would have us hold that subdivision (a)(1) is a general provision defining "public works" as construction work; (a)(2) is merely a specific subset of (a)(1); but some of the other subdivisions (such as (a)(4), governing carpet laying under a lease-maintenance contract) have independent effect. This would be a persuasive argument if subdivision (a)(2) were itself a subdivision of subdivision (a)(1) (i.e., were it numbered (a)(1)(A)). But subdivision (a)(2) is itemized as one of eight equal subdivisions (of subdivision (a)) which together constitute the definition of "public works," and must be given meaning. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274 [where there are several statutory provisions, courts should, if possible, adopt a construction that will give effect to them all].)

Defendant's argument that subdivision (a)(2) is limited by subdivision (a)(1) has some support, most notably in a 2005 administrative opinion by the Department of Industrial Relations which we discuss in part 4 below. But, upon consideration of the statutory language, the legislative history, multiple opinions of

"(4) The laying of carpet done under a building lease-maintenance contract and paid for out of public funds.
"(5) The laying of carpet in a public building done under contract and paid for in whole or in part out of public funds.
"(6) Public transportation demonstration projects authorized pursuant to Section 143 of the Streets and Highways Code.
"(7)(A) Infrastructure project grants from the California Advanced Services Fund pursuant to Section 281 of the Public Utilities Code.
"(8) Tree removal work done in the execution of a project under paragraph (1)."

13

the Department of Industrial Relations, and case law, we conclude plaintiffs have the better argument, and hold that subdivision (a)(2) applies even when the work does not meet the descriptors in subdivision (a)(1).

### ii. The statutory language

Our focus begins with the definition of "public works" found in section 1720. Significant to this appeal, and overlooked by both parties, is that the section 1720 definitional section is not exclusive to the prevailing wage law. The definition begins, "As used in this chapter, 'public works' means: . . . ." (§ 1720, subd. (a).) The chapter is Chapter 1 of Part 7 of Division 2 of the Labor Code, and the chapter is called, "Public Works." The chapter itself is comprised of multiple articles. The first article, in which the definition appears, governs "Scope and Operation." Other articles are article 1.5, "Right of Action"; article 2, "Wages" (including the prevailing wage law); article 3, "Working Hours"; article 4 (repealed), "Employment of Aliens"; and article 5, "Securing Workers' Compensation."

We find significant that the section 1720 definition of "public works" is not limited to the prevailing wage law, or even article 2 (Wages) in general. Instead, the definition of "public works" applies to all of the articles within the chapter.[13] Thus,

---

[13] Section 1720 defines "public works" "[a]s used in this chapter." This is to be contrasted with, for example, section 1720.2, which begins, "[f]or the limited purposes of Article 2 (commencing with Section 1770) of this chapter [(Wages)], public works also means . . . ." In other words, the Legislature clearly knew how to limit a definition of "public works" to the prevailing wage law when it wanted to do so. It did not do so with section 1720.

our interpretation of "public works" in the case before us likely will apply to the use of that term in other statutes. Those statutes include the obligation of a governing body awarding a public works contract to require the contractor to provide worker's compensation insurance. (§ 1860.) Other statutes relying on the same definition included a provision that no contractor shall discriminate in the employment of persons employed upon public works, and providing for penalties for such a violation (§ 1735); and the statute providing that any person who charges a fee for placing a person in public work thereby commits a misdemeanor (§ 1779). We see nothing in the legislation that suggests public works in these contexts apply only to construction-related activities.

The interrelationship of several statutes becomes relevant in light of defendant's argument that section 1720, subdivision (a) should be interpreted in light of the original purpose of the prevailing wage law. As we discuss next, the legislative history shows the intent behind subdivision (a) was broader than just its application to the prevailing wage law.

### iii. The relevant legislative history

The prevailing wage law was enacted in 1931, when several jurisdictions enacted such laws "in response to the economic conditions of the Depression, when the oversupply of labor was exploited by unscrupulous contractors to win government contracts when private construction virtually stopped. [Citation.]" (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 294 (*Duncan*).) There have been a number of economic upswings and downturns since 1931, but the prevailing wage law has remained and, in fact, has been expanded in coverage, leading to the conclusion

15

that the prevailing wage law is now understood to serve a purpose greater than to assist the construction industry and labor in recovering from the Great Depression.[14]

As it is now understood, "[t]he overall purpose of the prevailing wage law . . . is to benefit and protect employees on public works projects. This general objective subsumes within it a number of specific goals: to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.) We see nothing in the legislative history that suggests the Legislature intended to exclude from these benefits employees contracted to work for irrigation, utility, and similar

---

[14] Section 1771 was amended in 1974 to render maintenance work subject to the prevailing wage law. (*Reclamation Dist. No. 684 v. Department of Industrial Relations* (2005) 125 Cal.App.4th 1000, 1005 & fn. 6.) The section 1720 definition of "public works" was amended in 2000 to include design and preconstruction work (Stats. 2000, ch. 881, § 1); in 2001 to include installation work (Stats. 2001, ch. 938, § 2); in 2012 to include the assembly and disassembly of modular office furniture (Stats. 2012, ch. 810, § 1); in 2014 to include postconstruction work (Stats. 2014, ch. 864, § 1); and in 2017 to include tree removal (Stats. 2017, ch. 616, § 2) among other amendments. While we are not concerned with the interpretation of any of these amendments, each of them clearly sought to expand the protections of the prevailing wage law (and/or other public works protections) beyond an oversupply of construction labor in the 1930's.

districts simply because those employees are not working on construction projects.

The history of the adoption of the key language supports our conclusion.  The prevailing wage law was originally enacted in 1931.  Section 1 provided that the prevailing wage was to be paid to all laborers, workmen and mechanics "engaged in the construction of public works."  (Stats. 1931, ch. 397, § 1.)  The provision identified the state and certain political subdivisions (e.g., county, city, town) as the entities which could contract for public works.  (*Ibid.*)  Section 4 of the statute provided, in pertinent part, that "[c]onstruction work done for irrigation, utility, reclamation, improvement and other districts" shall be considered "public works" within the meaning of the statute. (Italics added.)

In 1937, California enacted the Labor Code, and with it came the first appearance of section 1720.  (Stats. 1937, ch. 90, § 1720, pp. 241-245.)  Subdivision (a) of the 1937 version of section 1720 is the origin of what is now subdivision (a)(1) – it defined as "public works" "[c]onstruction or repair work done under contract and paid for in whole or in part out of public funds . . . ."  Subdivision (b) of the 1937 statute is the origin of what is now subdivision (a)(2); it provided that "public works" also included "*[w]ork done* for irrigation, utility, reclamation and improvement districts, or other districts of this type."  (*Ibid.*, italics added.)

It is noteworthy that the 1937 statute removed the word "construction" from this second clause as it had appeared in section 4 of the 1931 prevailing wage law quoted above.  The question is why.

17

Defendant argues that "construction" was removed because it was duplicative of the subdivision (a) definition, but that the meaning of subdivision (b) (now (a)(2)) was still limited to *construction work* done for irrigation, utility, reclamation or improvement districts, as it had been in 1931. The argument is based on the implied premise that the definition of "public works" in the 1937 Labor Code was simply intended to be a restatement of the definition as it had appeared in the 1931 prevailing wage law.[15] It was not.

The Labor Code, as enacted, was proposed by the California Code Commission Office. The note to proposed section 1720 explained that the term "public work" was then "defined in several existing statutes" – and proceeded to identify all five of

---

[15] Defendant mistakenly cites *Universities Research Ass'n v. Coutu* (1981) 450 U.S. 754, 756-757, for the proposition that "when the California Legislature established the Labor Code in 1937, it replaced the 1931 Public Wage Rate Act with a revised, but substantively unchanged, version of the same law." The case says no such thing; it does not speak of California law at all. The statute the Supreme Court addressed in that case was the federal Davis-Brown Act. Defendant apparently intended to cite to *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555 (*State Building*), which contains the quotation defendant has in its brief. Even our reading of the *State Building* case reveals little germane to the present appeals. Although that case stated the general proposition that the law was substantially unchanged, it was not concerned with the language defining "public works." It dealt with the respective powers of the State and Charter cities in the prevailing wage field. A decision is authority only for the points actually involved and decided. (*PacifiCare Life and Health Ins. Co. v. Jones* (2018) 27 Cal.App.5th 391, 410.)

18

them: the prevailing wage law; the statute governing employment of aliens on public works; restrictions on the hours of labor on public work; statutes pertaining to retaining wages of employees; and a statute regarding fees for obtaining public work. (California Code Commission Office, Proposed Labor Code (1936) Note to section 1720, p. 85.) The note explains, "The provisions common to all these definitions have been placed in the above section [1720]." (*Ibid.*) One of the identified statutes prohibited the employment of aliens on public works. (Stats. 1931, ch. 398, p. 913.) Section 3 of that statute provided, "Work done for irrigation, utility, reclamation, improvement and other districts . . . shall be held to be 'public work' within the meaning of this act." It is this language – not the language of the prevailing wage law – which was codified into the definition of "public works" in the Labor Code.[16]

In sum, prior to the codification of the Labor Code, the prevailing wage law limited its definition of "public works" to construction, but the law preventing the employment of aliens on public works did not contain such a limitation when it came to work performed for irrigation, utility, and other districts. When the Labor Code was codified in 1937, the Legislature put multiple provisions applicable to "public works" in the same place, and combined their definitions of "public works." This had the effect of broadening the definition of "public works" beyond simply construction work as it applied to the prevailing wage law.

---

[16] Section 1850, which prohibited the employment of aliens on public works, remained the law until 1969, when it was declared unconstitutional. (*Purdy & Fitzpatrick v. State* (1969) 71 Cal.2d 566.)

### iv.     The administrative opinions

The trial court in this case relied heavily on a 2005 administrative opinion of the Department of Industrial Relations (Department), which concluded that subdivision (a)(2) of section 1720 must be limited by the "construction" language of subdivision (a)(1).  Before we discuss the deference we accord that opinion, it is important to place the opinion historically in the Department's treatment of section 1720, subdivision (a)(2).

In 2002, the Department issued an opinion on whether hauling wastewater materials from a wastewater treatment plant, for a public utility district, constituted a "public work" subject to the prevailing wage law.  The Department concluded that it was a "public work," within the meaning of subdivision (a)(2), because it was "work done for a utility district."  (*Hauling and Disposal of Wastewater Materials,* Public Works Case No. 2002-005 (July 1, 2002).)  No claim was made that hauling wastewater was construction-related work.

In 2005, the Department disagreed with its 2002 opinion, and de-designated it as precedential.  In contrast to that opinion, the Department held that the hauling of biosolids from a water treatment plant for a sanitation district did not constitute a "public work."  In the course of its discussion, it specifically concluded that "the most reasonable way to define the scope of section 1720(a)(2) is to require that the work fall within one of the types of covered work enumerated in section 1720(a)(1)." (*Hauling of Biosolids from Orange County*, Public Works Case No. 2005-009 (April 21, 2006) <https:www.dir.ca.gov/OPRL/ coverage/year2006/2005-009.pdf>[as of Nov. 30, 2018] (*Biosolids*).)

In 2007, the Department de-designated *all* of its public works opinions as precedential. It issued a notice explaining that "posted public works coverage determination letters provide an ongoing advisory service only. The letters present the Director of [the Department]'s interpretation of statutes, regulations and court decisions on public works and prevailing wage coverage issues and provide advice current only as of the date each letter is issued. In attempting to relate this advice to your own matter, care must be taken to ensure that the advice has not been superseded by subsequent legislative or administrative action or court decisions." (Correction of the Important Notice to Awarding Bodies and Interested Parties Regarding the Department's Decision to Discontinue the Use of Precedent Determinations. <https://www.dir.ca.gov/OPRL/09-06-2007(pwcd).pdf>[as of Nov. 30, 2018]; see *Duncan, supra,* 162 Cal.App.4th at pp. 302-303.)

Finally, in 2016, the Department reversed itself on section 1720, subdivision (a)(2) again, this time holding that maintenance of equipment for a water district constituted a public work under that subdivision. (*Public Works Contractor Registration Requirement for Maintenance Work*, Public Works Case No. 2015-016 (Feb. 5, 2016) <https:www.dir.ca.gov/OPRL/coverage/year2016/2015-016.pdf>[as of Nov. 30, 2018].)

The trial court relied heavily on the second, *Biosolids*, opinion, concluding that it was entitled to deference, and, ultimately, "carrie[d] decisive weight." Under the circumstances, however, we conclude that it is entitled to "not much, if any, deference." (*Duncan, supra,* 162 Cal.App.4th at p. 302.) Indeed, there were three reasons given in the *Duncan* opinion for why the Department's determination should be given minimal deference

in that case, and they apply equally to this one.  First, as we have discussed above, the Department has itself concluded that its decisions are not precedential and should not be entitled to deference.  (*Id.* at pp. 302-303.)  Second, "judicial deference to an administrative interpretation of a statute is extended if the interpretation is longstanding, consistent, and if the interpretation was contemporaneous.  [Citation.]"  (*Id.* at p. 303.)  As we have explained, the *Biosolids* opinion that section 1720, subdivision (a)(2) has no independent effect outside subdivision (a)(1) was not long standing; opinions both before and after it took the opposite view.  Thirdly, "the nature of the issue before us involves the quintessential judicial function.  Because the issue here is a pure one of statutory interpretation, this is not a situation where the administrative agency ' " 'has a comparative interpretative advantage over the courts." ' "  (*Duncan,* at p. 304.)  "To the contrary, it is the judiciary which has the ultimate authority for determining the meaning of a statute."  (*Ibid.*)

"In short, while we consider the Director's [of the Department] current interpretation of section 1720, we do not extend that interpretation any particular deference.  Because there is no factual dispute, only the question of how that statute is to be construed and applied, we exercise our independent judgment."  (*Duncan, supra,* 164 Cal.App.4th at pp. 304-305.)  The *Biosolids* opinion, which is not precedential and has since been superseded by the Department itself, does not justify ignoring the plain language of the statute and its legislative history.

v.        **Existing case authority**

Although it does not appear that any case has directly addressed the precise issue before us, one case has concluded, as

22

we do, that subdivision (a)(2) of section 1720 has independent effect and is not merely limited to "public works" as defined in subdivision (a)(1).

*Azusa Land Partners v. Department of Industrial Relations* (2011) 191 Cal.App.4th 1 considered the mirror image of the argument raised by defendant in this case. In *Azusa,* the contractor was hired to do a large construction project, which was funded, in part, by bonds obtained by an improvement district. The issue was whether the entire project constituted a public work, or if only that portion paid for by the improvement district did. (*Id.* at pp. 10-11.) Under the plain language of subdivision (a)(1), the entire project would constitute a public work because it was "[c]onstruction . . . work done under contract and paid for in whole or in part out of public funds." The contractor took the position that subdivision (a)(2) was a more specific provision governing work done for improvement districts, and that, as a more specific provision, it governed over the general provision of subdivision (a)(1), and, therefore, only the improvements actually funded by the improvement district constituted public works. (*Azusa,* at p. 13.) The court therefore had to construe whether subdivision (a)(2) was a specific application of a general subdivision (a)(1) – or if, to the contrary, the two provisions had equal dignity. It chose the latter path. "Under [subdivision] (a)(2)'s broader definition, all work done for an improvement district—even that which would not be covered by the narrower categories listed in [subdivision] (a)(1)—is 'public work.' Under this reasoning, with which we concur, subdivision (a)(2) may apply independently to cover some work for an improvement district not otherwise encompassed within subdivision (a)(1)'s enumerated categories." (*Azusa, supra,* at p. 21.)

23

### vi.     The "operations" exception

Our conclusion that subdivision (a)(2) of section 1720 is not limited by subdivision (a)(1) means that the recycling work done for the sanitation districts in this case constitutes "public work" unless a statutory exception applies.  Defendant argues that the "operations" exception applies.  We quote section 1720, subdivision (a)(2)'s definition of "public work" again:  "Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type.  'Public work' does not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages."

Defendant's argument that the operations exception applies is raised for the first time in its respondent's brief on appeal; it did not raise this argument in its motion to strike in the trial court.  We therefore consider the argument waived.  In any event, it is foreclosed by the plain language of the statute.  While work done for "irrigation, utility, reclamation, and improvement districts, and other districts of this type" is defined as public work, the operations exception applies only to the specific "operation of the irrigation or drainage system of any irrigation or reclamation district," not the operation of all of the identified districts in general.  The operation of a recycling system for a sanitation district is not the operation of an irrigation or drainage system of an irrigation or reclamation district.  The exception simply does not apply.

### c.     *Conclusion*

In sum, we hold that the "construction" language limiting the definition of "public works" in subdivision (a)(1) of section 1720 does not also limit the definition of "public works" in

subdivision (a)(2) of that statute. Instead, subdivision (a)(2) is to be read independently. When we do so, we conclude defendant's motion to strike plaintiffs' prevailing wage law claim was improperly granted.

## 2. *The claim of failure to pay minimum wages*

As we have observed, there is no issue on this appeal about the propriety of the judgment to the extent it awarded plaintiffs meal period premium pay under section 226.7. Under section 512, defendant was required to provide plaintiffs "with a meal period of not less than 30 minutes." (§ 512, subd. (a).) The remedy for its failure to do so is the premium pay specified in section 226.7.[17]

The disputed issue is whether or not, in addition to recovering an hour of premium pay, plaintiffs are *also* entitled to recover wages for the three to five minutes they were required to work during their meal periods.

As indicated earlier, the trial court concluded that employees "who lost three to five minutes of a 30 minute break" were not entitled to recover wages "for all or any portion of the meal period." Plaintiffs challenge the trial court's conclusion that premium pay for the meal period violation is their exclusive remedy, contending that the "the right to be paid the minimum wage" for "time worked during meal periods," and "the right to a

---

[17] Section 226.7, subdivision (c) provides: "If an employer fails to provide an employee a meal or rest or recovery period in accordance with state law, including . . . an applicable statute . . . or order of the Industrial Welfare Commission, . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided."

meal period premium for non-compliant meal periods are separate rights" giving rise to distinct and cumulative remedies.

We agree with plaintiffs to this extent: the right to be free from employer control for a 30-minute meal period, and the right to be paid for time worked during that meal period, are distinct rights with distinct remedies. The remedy for an employer violation of the former right is the hour of premium pay provided under section 226.7. The remedy for the latter is payment of wages for time worked (see § 1194), along with any applicable penalties for the failure to pay for time worked when the wages were due. But we find no persuasive basis in legal authorities to support plaintiffs' claim that their remedy for time worked during the meal period is payment of wages for the full 30-minute meal period, rather than payment of wages for the three to five minutes actually worked.

*a.     The legal background*

The Supreme Court has described the origin and development of California law governing wages and working conditions in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026-1027 (*Brinker*). As pertinent here, *Brinker* explained that nearly a century ago, the Legislature established the Industrial Welfare Commission (IWC), and delegated to it the authority "to investigate various industries and promulgate wage orders fixing for each industry minimum wages, maximum hours of work, and conditions of labor." (*Id.* at p. 1026.) In 1916, the IWC "began issuing industry- and occupationwide wage orders specifying minimum requirements with respect to wages, hours, and working conditions [citation]. In addition, the Legislature has from time to time enacted statutes to regulate wages, hours, and working conditions directly. Consequently, wage and hour

26

claims are today governed by two complementary and occasionally overlapping sources of authority:  the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC."[18]  (*Ibid.*)

*Brinker* tells us the statutory provisions " 'are to be liberally construed with an eye to promoting [employee] protection.' " (*Brinker, supra,* 53 Cal.4th at pp. 1026-1027.)  The IWC's wage orders "are entitled to 'extraordinary deference, both in upholding their validity and in enforcing their specific terms.' " (*Id.* at p. 1027.)  "[T]he relevant wage order provisions must be interpreted in the manner that best effectuates that protective intent."  (*Ibid.*)  Indeed, "[t]he IWC's wage orders are to be accorded the same dignity as statutes.  They are 'presumptively valid' legislative regulations of the employment relationship [citation], regulations that must be given 'independent effect' separate and apart from any statutory enactments [citation].  To the extent a wage order and a statute overlap, we will seek to harmonize them, as we would with any two statutes."  (*Ibid.*)

Here, wage order No. 4, governing professional, technical, clerical, mechanical and similar occupations, applies.  The wage order requires the employer to "pay to each employee . . . not less than the applicable minimum wage for all hours worked," and "hours worked" means "the time during which an employee is subject to the control of an employer . . . ."  (Cal. Code Regs., tit. 8, § 11040, subds. 4(B) & 2(K).)

---

[18]     The Legislature stopped funding the IWC in 2004, but its wage orders remain in effect.  (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, fn. 4 (*Murphy*).)

The wage order also regulates meal periods. The order distinguishes on-duty and off-duty meal periods, sets the requirements for each, and (since it was amended in October 2000) specifies a remedy – as in section 226.7, one hour of premium pay – "[i]f an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order." (Cal. Code Regs., tit. 8, § 11040, subd. 11.)

There are two pertinent provisions of the wage order governing meal periods. The first – which has been in the wage order in substantially the same form for many decades – states:

> "(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time." (Cal. Code Regs., tit. 8, § 11040, subd. 11(A).)

The second pertinent provision was added to the wage order as of October 1, 2000. It states:

> "(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of

28

pay at the employee's regular rate of compensation for each workday that the meal period is not provided." (Cal. Code Regs., tit. 8, § 11040, subd. 11(B).)

The IWC explained, in its "Statement as to the Basis" for the amendment, that it had "heard testimony and received correspondence regarding the lack of employer compliance with the meal and rest period requirements of its wage orders. The IWC therefore added a provision to this section that requires an employer to pay an employee one additional hour of pay at the employee's regular rate of pay for each work day that a meal period is not provided." (IWC wage orders Nos. 1 – 13, 15 & 17, Jan. 1, 2001, Statement as to the Basis, § 11, p. 20, <https://www.dir.ca.gov/IWC/wageorderindustriesprior.htm> [as of Nov. 30, 2018].)

The latter provision of the wage order became effective shortly before section 226.7 went into effect on January 1, 2001. Section 226.7 made the wage order's stated remedy for a meal period violation – "one additional hour of pay at the employee's regular rate of compensation" – a statutory remedy as well.

> b.    *Contentions and conclusions*

Plaintiffs rely on the meal period provisions of the wage order to insist that, in addition to the premium pay remedy under section 226.7 and the wage order, they are entitled to payment of the minimum wage for the entire 30 minutes of the improperly shortened meal periods. Plaintiffs contend in substance that truncating the meal period by a few minutes created a *de facto* "on duty" meal period, requiring the entire 30 minutes be "counted as time worked" under the wage order. Defendant, on the other hand, contends plaintiffs are entitled only to the

29

premium pay, and are not entitled to compensation for time worked during the meal period.  Both are mistaken.

### c.      Defendant's contention

We begin with the observation that plaintiffs have the right to be paid for all hours worked.  "Hours worked" is defined as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so."  (Cal. Code Regs., tit. 8, § 11040, subd. 2(K).)  Plaintiffs were subject to defendant's control for three to five minutes of every meal period.  They are entitled to compensation for that work.  While defendant argued below that this was a "de minimis" incursion into the 30-minute meal period, the trial court properly rejected that notion, stating:  "The evidence is that employees lost three to five minutes of a 30 minute break.  A 13 percent deprivation of a break is not de minimis.  When time is scarce, minutes count.  On a 30-minute break, time is scarce."

Defendant insists that premium pay is the exclusive remedy for a meal period violation.  But there was *both* a meal period violation (failure to provide a 30-minute period free from employer control) *and* a minimum wage violation (failure to pay wages for time actually worked during the meal period).  These are violations of separate rights for which there are separate statutory remedies.

Defendant says the Supreme Court "firmly debunked" the idea that plaintiffs could recover for both violations in *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244 (*Kirby*), but *Kirby* did no such thing.  Indeed, *Kirby,* like other authorities, confirms the distinct regulatory objectives of protecting wages and ensuring the health and welfare of workers.  (See also

*Murphy, supra,* 40 Cal.4th at p. 1104 [an employee forced to forgo a meal period "loses a benefit to which the law entitles him or her," and "[w]hile the employee is paid for the 30 minutes of work, the employee has been deprived of the right to be free of the employer's control during the meal period"].)

There was no contention in *Kirby* that minimum wages were owed for hours worked during meal periods. *Kirby* was an attorney fee case, and concluded, among other things, that "section 1194 does not authorize an award of attorney's fees to employees who prevail on a section 226.7 action for the nonprovision of statutorily mandated rest periods," and that section 1194 does not apply "to anything other than claims for unpaid minimum wages" or unpaid overtime. (*Kirby, supra,* 53 Cal.4th at pp. 1254, 1255, 1252; see *id.* at p. 1257 ["the legal violation triggering the [section 226.7] remedy" is "nonprovision of meal or rest breaks," and not "nonpayment of wages"].)

Nothing the court said in *Kirby* is inconsistent with a plaintiff's right to recover both minimum wages for time worked during meal periods and premium pay for the meal period violation. Quite the contrary. This is not a case where defendant paid the employees for all hours worked and simply failed to provide a meal period during that time. Defendant made the employees work for part of the meal period, did not pay them for the time worked, and in addition did not comply with the meal period requirement – which is "not aimed at protecting or providing employees' wages," but instead is concerned with "ensuring the health and welfare of employees by requiring that employers provide meal and rest periods as mandated by the IWC." (*Kirby, supra,* 53 Cal.4th at p. 1255.)

31

In short, *Kirby* does not support defendant's assertion that premium pay is plaintiffs' exclusive remedy for two different violations, and neither does any other authority. The authorities are to the contrary. When a meal period is considered an "on duty" meal period, the employee is entitled to payment for time worked, and also to premium pay if the requirements for a permissible on-duty meal period are not met. An opinion letter from the Division of Labor Standards Enforcement (DLSE) supports this point, and so does the *Brinker* opinion.

In a case involving a driver transporting hazardous materials who was required to remain with or close to his truck at all times, the DLSE opined: "[A] meal period provided to a Company driver transporting hazardous materials who is not relieved of his or her duty to remain with or remain close to his or her truck as a consequence of their obligations under [federal law] is not an off-duty meal period . . . . *[T]he meal period under these circumstances is considered an on-duty meal period and must be counted as time worked. Furthermore, unless the conditions are met for an on-duty meal period as required under [the wage order], such a driver would be entitled to one additional hour of pay at the employee's regular rate of compensation under Labor Code [section] 226.7 and [the wage order]." (Meal Periods for Fuel Carriers Subject to Federal Safety Regulations* (June 9, 2009), pp. 5-6 italics added, <https://www.dir.ca.gov/dlse/ opinions/ 2009-06-09.pdf> [as of Nov. 30, 2018] (*Fuel Carriers*).)

*Brinker* noted with approval the DLSE's position that both remedies are available. In the course of the court's discussion of the fact that an employer must relieve its employee of all duty during a meal period, but need not ensure that no work is done, the court said this: "[B]ecause the defining characteristic of on-

32

duty meal periods is failing to relieve an employee of duty, . . . it follows that off-duty meal periods are similarly defined by actually relieving an employee of all duty:  doing so transforms what follows into an off-duty meal period, whether or not work continues." (*Brinker, supra,* 53 Cal.4th at pp. 1039-1040.)  By way of footnote, the court added:

"If work does continue, the employer will not be liable for premium pay.  At most, it will be liable for straight pay, and then only when it 'knew or reasonably should have known that the worker was working through the authorized meal period.' [Citations.]  ***The DLSE correctly explains the distinction in its amicus curiae brief:  'The employer that refuses to relinquish control over employees during an owed meal period violates the duty to provide the meal period and owes compensation [and premium pay] for hours worked.***  The employer that relinquishes control but nonetheless knows or has reason to know that the employee is performing work during the meal period, has not violated its meal period obligations [and owes no premium pay], but nonetheless owes regular compensation to its employees for time worked.' " (*Brinker, supra,* 53 Cal.4th at p. 1040, fn. 19 [bracketing of "and premium pay" in original; boldface & italics added].)

Accordingly, the trial court erred when it concluded plaintiffs could not recover minimum wages for time worked during their meal periods.  We therefore reverse the judgment on that point and remand with instructions to award minimum wages for time worked during the meal periods.

### d.    *Plaintiffs' contention*

That brings us to plaintiffs' contention that, because they were not relieved of all duty for the entire 30-minute meal period,

they are entitled to the minimum wage for 30 minutes (rather than only for the three to five minutes actually worked), in addition to premium pay for the meal period violation. This too is mistaken.

Plaintiffs rely on this language in the IWC's wage order: "Unless the employee is relieved of all duty during a 30 minute meal period, the meal period *shall be* considered an on duty meal period and counted as time worked." From this principle, plaintiffs conclude their truncated meal periods were transformed into on-duty meal periods, and therefore must be "counted as time worked" under the wage order.

Plaintiffs correctly point out that the equivalent of an on-duty meal period may exist, even if the conditions for a legally permissible on duty meal period do not. That much is obvious from the authorities we have just discussed. And, we acknowledge that, if considered in isolation, the wage order provision just quoted could be construed as plaintiffs suggest. But we cannot construe the provision in isolation. Instead, we must construe it in conjunction with the rest of the wage order and with the statute, all of which we must harmonize. (See *Brinker, supra,* 53 Cal.4th at p. 1027.) Doing so, we necessarily conclude that a truncated meal period, such as occurred in this case, is not in every case the equivalent of an on-duty meal period. This conclusion flows from settled legal principles, from the history of the wage order, and from the circumstances of this case, which are fundamentally different from those in the authorities plaintiffs cite.

At the outset, we bear in mind that plaintiffs are asserting a claim of failure to pay the minimum wage. The settled legal principle applicable to a claim for minimum wages is that

34

employees must be paid the minimum wage for all hours worked – and "[h]ours worked" means "the time during which an employee is subject to the control of an employer . . . ." (Cal. Code Regs., tit. 8, § 11040, subd. 2(K).)

In this case plaintiffs were entirely free of employer control for (on average) 26 minutes of the 30-minute period. Thus the "defining characteristic of on-duty meal periods" – "failing to relieve an employee of duty" (*Brinker, supra,* 53 Cal.4th at p. 1039) – does not exist for most of the 30-minute meal period. Plaintiffs were "actually reliev[ed] . . . of all duty" during that time (the defining characteristic of an off-duty meal period). (*Id.* at p. 1040.) In other words, this case involves meal periods that were partly on-duty but mostly off-duty: plaintiffs were subjected to defendant's control for an average of four minutes, and were otherwise "free to come and go as they please." (*Id.* at p. 1037.) Under minimum wage provisions, this entitled them to four minutes of compensation – not 30 minutes.

It is clear, then, that plaintiffs' assertion they should be paid the minimum wage for the entire 30-minute meal period is *not* actually based on minimum wage requirements; it is based solely on the meal period provisions of the wage order. But both the wage order as amended (and the statute) impose only one consequence for "fail[ure] to provide an employee a meal period in accordance with the applicable provisions of this order," and that is "one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided." (Cal. Code Regs., tit. 8, § 11040, subd. 11(B).) Plaintiffs, in effect, seek to increase the consequences *for a meal period violation* to one and a half hours of pay instead of one

hour.  There is no basis in the statute or wage order, and no other legal authority, for doing so.

The history of the meal period provisions of the wage order and the DLSE's implementation of those provisions confirm that neither the IWC nor the Legislature intended the result plaintiffs seek.

First, the wage order provision on which plaintiffs rely – requiring the 30-minute meal period to be "counted as time worked" unless the employee is relieved of all duty – pre-dated by many decades the IWC's amendment to the wage order in 2000 (and the enactment of section 226.7) that provided a remedy for meal period violations.  (The same language is in the 1976 wage order (IWC wage order No. 4-76, § 11(A) (effective Oct. 18, 1976)), and the language dates back in substance to 1947.)[19]  Thus, before the amendment to the wage order, and the passage of section 226.7, both of which occurred in 2000, there was no remedy for a meal period violation.  The only "remedy" for any failure to relieve the employee of all duty for 30 minutes was to count the 30-minute meal period as time worked, necessarily requiring compensation for that time.  As the IWC observed when it amended the wage order, that "remedy" did not work:  the IWC amended the order because of "the lack of employer compliance

---

[19]     In 1947, the meal period provision stated:  "30-minute meal period after 5 consecutive hours of work.  'On duty' meal period is permitted only when the nature of the work prevents an employee from being relieved of all duty, and such 'on duty' meal period must be counted as hours worked without deduction from wages."  (Wage and Hour Manual, The Bureau of National Affairs, Inc. (1947 ed.), Part IV, State Wage, Hour, and Child Labor Laws, §§ 2.053 & 2.53, pp. 3302, 3307 (June 1, 1947).)

with the meal and rest period requirements of its wage orders." After the amendment, by contrast, the employer owed compensation (as it always had) " 'for hours worked' " *and* owed an additional hour of pay (premium pay) for the meal period violation. (See *Brinker, supra,* 53 Cal.4th at p. 1040, fn. 19.)

Second, the legal authorities, both before and after the IWC and the Legislature added a remedy for meal period violations in 2000, involved cases where the employees were subject to the employer's control throughout the statutorily mandated meal period. In those circumstances, the employee was entitled to payment of wages for the whole meal period, because the employee was subject to employer control during the entire meal period. (See, for example, *Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968, 979 [employees who were required to remain on the work premises during their lunch hour had to be compensated for that time under the definition of "hours worked"], disapproved on another point in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 574; see also *Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 842 [citing *Bono* as holding that "time employee is required to remain at workplace during lunch constitutes hours worked even when relieved of all job duties"]; *Fuel Carriers, supra,* <https://www.dir.ca.gov/dlse/opinions/2009-06-09.pdf>, p. 5 [where truck driver was required by law to remain with or close to truck during meal period, the meal period was considered on-duty and had to be counted as time worked] [as of Nov. 30, 2018].)

None of those authorities addresses a circumstance where, as here, the employee *is* provided a control-free meal period, albeit not for the full 30 minutes. Had such circumstances

37

occurred prior to the wage order amendment and section 226.7, it may well have been appropriate to require payment for the whole 30-minute meal period, as no other remedy existed for the meal period violation.  But with the amended wage order and the passage of section 226.7, the IWC and the Legislature went a step further, by expressly requiring the employer to compensate the employee with an hour's pay, not just 30 minutes, at the regular rate of pay, for the meal period violation.  There is no evidence the IWC or the Legislature intended to require the employer to compensate the employee for an hour *and* 30 minutes for a meal period violation, unless the employee actually worked (or was subject to the employer's control) for the entire 30-minute period.

In short, the wage order provision plaintiffs cite has no application where the employee is fully compensated, both for his or her time worked during the meal period and for the meal period violation.

Plaintiffs place particular reliance on language in a DLSE opinion letter issued in 1992, stating that "[s]ince the IWC orders require that the employee have a duty-free meal period, any 'duty' which interferes with the meal period (even if the 'duty' required *de minimis* time) would require that the whole of the meal period be paid."  (*Use of 'Beepers,'* Jan. 28, 1992, <https://www.dir.ca.gov/dlse/opinions/1992-01-28.pdf>, p. 3 [as of Nov. 30, 2018] (*Use of Beepers*).  But that case was decided years before the wage order was amended and section 226.7 was enacted.  And the circumstances in *Use of Beepers* were not significantly different from those in other cases where the DLSE has required payment of wages for the entire 30-minute meal period.  In *Use of Beepers*, the employee was required to wear a pager during the entirety of the meal period and to respond to

38

any pager call that might occur during that time. It was in that context that the DLSE opined that, if the employee handled a pager call during the meal period, even if the call required "*de minimis*" time, "the whole of the meal period [must] be paid." (*Use of Beepers,* at p. 3.) Significantly, the DLSE concluded that if the employee "who is simply required to wear the pager is not called upon during the meal period to respond, there is no requirement that the meal period be paid for," but "if the employee responds, as required, to a pager call during the meal period, the whole of the meal period must be compensated." (*Ibid*.) This opinion letter does not support plaintiffs' position for the additional reason that the DLSE did not conclude that being subject to the employer's control as a consequence of having to wear and respond to a pager was compensable for the entire meal period unless the employee had to respond to a page.[20]

In short, there is no contradiction between the DLSE's *Use of Beepers* opinion and the conclusion we reach here. *Use of Beepers,* pre-dating the amended wage order, required payment of 30 minutes in wages for requiring an employee to work during any part of the 30-minute meal period. The amended wage order requires more, expressly providing a remedy of one hour's pay for any intrusion, however small, into the meal period. We can

---

[20] Much more recently, the Supreme Court held that on-call rest periods, where employees were required to keep their radios and pagers on and to respond when the need arose, "do not satisfy an employer's obligation to relieve employees of all work-related duties and employer control." (*Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 260-261, 270; see *id.* at p. 272 [employers had the option of providing another rest period to replace the interrupted rest period or pay the premium pay set forth in section 226.7].)

require no more, so long as employees are also compensated for all time worked during any shortened meal period.

Plaintiffs also rely on language from a 2002 DLSE opinion that responded (in the negative) to the question whether an employer in the fast food industry could have an on-duty meal period arrangement with an employee. As a prelude to its analysis, the opinion recited the general rule requiring an off-duty meal period and its requirements (no requirement to work, no employer control, 30-minute minimum), continuing: "If any of these conditions are not present, the time, if any, during which the employee is permitted to eat his or her meal is considered on-duty time, which is treated as 'hours worked' for which the employee must be paid at his or her regular rate of pay." (*On-Duty Meal Periods,* Sept. 4, 2002, p. 2, <https://www.dir.ca.gov/dlse/opinions/2002-09-04.pdf>[as of Nov. 30, 2018].) We see nothing in this opinion that is pertinent to the very different facts of this case. Like the other rulings, the DLSE's opinion contemplated an employee on duty during the 30-minute meal period – not a shortened meal period. So far as we are aware, the DLSE has not offered an opinion on circumstances comparable to those at issue here.[21]

To summarize: No authority supports the claim that the wage order as it exists today requires payment of 30 minutes of wages for any incursion, however short, into the meal period, in

---

[21] Plaintiffs also cite *Alvarez v. IBP, Inc.* (9th Cir. 2003) 339 F.3d 894, 913-914, where the court held that the state of Washington's meal period regulations required compensation for the full 30-minute period if the employer intruded upon or infringed the 30 minutes "to any extent." We see no reason to consider a federal court's construction of the law of another state.

addition to the hour of premium pay for the same incursion into the meal period. The wage order as amended and section 226.7 both expressly provide the remedy for failure to provide a meal period. That remedy is one hour of pay at the employee's regular rate for each workday that the meal period is not provided. The wage order also requires payment for all "hours worked," expressly defined as "the time during which an employee is subject to the control of an employer."

We therefore construe the wage order to require premium pay for the meal period violation and payment of minimum wages for all time worked – but no more. "Time worked" does not include time during which employees "are relieved of any duty or employer control and are free to come and go as they please." (*Brinker, supra,* 53 Cal.4th at p. 1037; see *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 584 [finding persuasive the DLSE's interpretation of "hours worked," namely, " 'Under California law it is only necessary that the worker be subject to the "control of the employer" in order to be entitled to compensation.' "].) Where there is no control, no compensation for "hours worked" is due. This construction fulfills both legislative mandates: that employees be paid for all time worked, and that employers provide an uninterrupted 30-minute meal period (or else pay an extra hour of compensation). We are persuaded neither the Legislature nor the IWC intended anything more.[22]

---

[22] We asked the parties to address in supplemental briefs the impact, if any, of the recently decided case of *Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829. We have considered those briefs and conclude the case does not affect our analysis.

### 3.     *Civil penalties for failure to pay minimum wages*

Plaintiffs sought civil penalties under PAGA, which permits recovery in a representative action of any civil penalties that otherwise may be assessed for violations of the Labor Code. (§ 2699.)  Plaintiffs sought penalties for the meal period violations under section 558, and for the minimum wage violations under section 1197.1.  The trial court awarded penalties for the meal period violations, but found plaintiffs' claim for penalties under section 1197.1 "fails because it is based on [plaintiffs'] invalid claim for failure to pay minimum wages." Because we have found the trial court erred in finding no minimum wages were owed for time worked during the shortened meal periods, it necessarily follows that the trial court also erred in rejecting plaintiffs' claim for civil penalties for the payment of "a wage less than the minimum . . . ."  (§ 1197.1, subd. (a).)

We note that, while defendant is subject to penalties for violations of *both* section 512 (the meal period claims) *and* section 1194 (the minimum wage claims), the court "may award a lesser amount than the maximum civil penalty amount specified . . . if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  (§ 2699, subd. (e)(2).)  We express no opinion on what penalty, if any, should be awarded for the violation of section 1194 greater than the $53,293.50 already awarded for the violation of section 512.

### 4.     *Waiting time penalties.*

"The prompt payment provisions of the Labor Code impose certain timing requirements on the payment of final wages to employees who are discharged ([§ 201]) and to those who quit their employment (§ 202)."  (*McLean v. State of California* (2016)

42

1 Cal.5th 615, 619.) "An 'employer' that 'willfully fails to pay' in accordance with sections 201 and 202 'any wages of an employee who is discharged or who quits' is subject to so-called waiting-time penalties of up to 30 days' wages. (§ 203, subd. (a).)" (*Ibid.*)[23]

In the trial court, plaintiffs sought waiting time penalties. Their claim was based both on failure to treat the whole meal period as "time worked" and on failure to pay the meal period premium pay. Defendant contended, among other points, that its alleged violations were not willful. The trial court held no waiting time penalties applied, because no minimum wages were owed for the shortened meal periods, and because the meal period premiums were "not a wage that could trigger waiting time penalties."

The question whether violations of meal period regulations give rise to claims for waiting time penalties under section 203 is among the issues raised in a request for certification of questions from the Ninth Circuit Court of Appeals, recently granted by the California Supreme Court. (*Stewart v. San Luis Ambulance, Inc.* (9th Cir. 2017) 878 F.3d 883, request for certification granted Mar. 28, 2018, S246255.) We need not consider the issue in this case because we have concluded, contrary to the trial court's

---

[23] Under section 201, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." (§ 201, subd. (a).) Under section 202, "[i]f an employee . . . quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting." (§ 202, subd. (a).)

43

ruling, that defendant owed minimum wages for time worked during the improperly shortened meal periods. Because this is a proper basis for plaintiffs' claim for waiting time penalties under section 203, we must reverse the trial court's judgment to the extent it denies recovery of waiting time penalties and remand for consideration of plaintiffs' claim and defendant's contentions.

**5.** ***The attorney fee appeal***

In its motion for attorney fees under PAGA and Code of Civil Procedure section 1021.5, counsel sought compensation for 1,745.80 hours of attorney time at rates of $650 and $600 an hour, producing a lodestar of $1,095,140. The trial court questioned the lodestar amount, but used it and applied a "negative" multiplier of 10 percent. Among other things, the court observed the number of hours was "suspect"; the hourly rates were "purely aspirational"; the case "addressed a minor problem and achieved a minor result"; the case (the law, the facts and the trial) was simple and strongly in plaintiffs' favor ("not a highly risky venture"); and a cross-check confirmed "a 0.1 multiplier is appropriate," because it yielded a fee that was 39 percent of the recovery. The court thus awarded attorney fees of $109,514.

As noted at the outset, the amount of plaintiffs' recovery will necessarily change as a result of our decision, and this may in turn affect the trial court's analysis of the appropriate amount of the attorney fee award. We therefore vacate the award and remand to enable the court to exercise its discretion to reconsider the amount of the fee award, should it so choose.

## DISPOSITION

The judgment in the merits appeal (B276420) is reversed. The cause is remanded to the trial court for further proceedings

44

to address the calculation of minimum wages owing, the award of civil penalties based on failure to pay minimum wages, and reconsideration of waiting time penalties, as well as to allow plaintiffs to pursue their prevailing wage law claim. The trial court's order awarding attorney fees (B279838) is vacated to permit the trial court to reconsider attorney fees following remand.

The plaintiffs shall recover their costs on appeal.


RUBIN, J.

I concur:


BIGELOW, P.J.

**Kaanaana et al. v. Barrett Business Services, Inc., et al.**
**B276420; B279838**
**Grimes, J., concurring and dissenting.**

I concur with the majority opinion on all points except the application of the prevailing wage to the work performed by plaintiffs.  In my view, the statutory provisions requiring payment of prevailing wage rates do not apply because plaintiffs are not engaged in "public works" within the meaning of the prevailing wage law (Lab. Code, §§ 1720-1861).[1]

I agree with the majority that "[w]ork done for irrigation, utility, reclamation, and improvement districts, and other districts of this type" is not confined to "construction work."  As the majority correctly points out, the prevailing wage law originally protected construction workers, and has been expanded over the years "to benefit and protect employees on public works projects."  (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.)

But as I see it, throughout the various expansions of the term "public works" in the section 1720 definition, the term has in every case involved work on "public works projects" that in some way concerns *infrastructure* – the physical facilities that constitute "public works projects" or public improvements.[2]  I have never seen the term applied to routine work (here, sorting

---

[1]     Further statutory references are to the Labor Code.

[2]     Black's Law Dictionary (10th ed.) at page 900 defines "infrastructure" as follows:  "(1927)  The underlying framework of a system; esp., public services and facilities (such as highways, schools, bridges, sewers and water systems) needed to support commerce as well as economic and residential development."

recyclables) performed inside a publicly owned or operated facility, having nothing to do with work on or affecting the physical facility itself. As a consequence, I am not persuaded that the Legislature – either in 1937 or later – intended to treat "[w]ork done for . . . improvement districts" in a radically different fashion from work done for other agencies of the state and its political subdivisions.

I believe my construction of the definition of "public works" is entirely consonant with the intent of the Legislature, is not contradicted by the limited legislative history available on the point, and is supported by principles of statutory construction that require us to read statutory provisions in a way that does not lead to disharmony with the rest of the statute.

1.    **The Pertinent Statutory Provisions**

For clarity, I repeat the text of the statutory provisions at issue and already quoted in the majority opinion.

The prevailing wage law requires that, "[e]xcept for public works projects of one thousand dollars ($1,000) or less," the general prevailing rate of per diem wages for similar work "shall be paid to all workers employed on public works." (§ 1771.) This prevailing wage requirement applies only to work performed under contract (not to work carried out by a public agency with its own employees), and it applies to contracts for maintenance work. (*Ibid.*)

Section 1720 defines "public works." There are eight categories of "public works" included in the definition. The second of these is at issue in this case.

The first category of public works (§ 1720, subd. (a)(1), hereafter section 1720(a)(1)) is: "Construction, alteration, demolition, installation, or repair work done under contract and

2

paid for in whole or in part out of public funds . . . . For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction, including, but not limited to, inspection and land surveying work, and work performed during the postconstruction phases of construction, including, but not limited to, all cleanup work at the jobsite. For purposes of this paragraph, 'installation' includes, but is not limited to, the assembly and disassembly of freestanding and affixed modular office systems."

The second category of public works (§ 1720, subd. (a)(2), hereafter section 1720(a)(2)) is: "Work done for irrigation, utility, reclamation, and improvement districts, and other districts of this type. 'Public work' does not include the operation of the irrigation or drainage system of any irrigation or reclamation district . . . ." (For simplicity, I will refer to this provision as "[w]ork done for . . . improvement districts," since a sanitation district is a "district[] of this type.")

There are six additional categories of public works. They are all what I would describe as construction-related activities or work on public improvements – that is, work that in one way or another affects the infrastructure that constitutes a public facility or project. Thus, public works also include:

"Street, sewer, or other improvement work . . . ." (§ 1720, subd. (a)(3).)

"The laying of carpet done under a building lease-maintenance contract and paid for out of public funds." (§ 1720, subd. (a)(4).)

"The laying of carpet in a public building done under contract and paid for in whole or in part out of public funds." (§ 1720, subd. (a)(5).)

3

"Public transportation demonstration projects . . . ."
(§ 1720, subd. (a)(6).)

"Infrastructure project grants" from a fund pursuant to the Public Utilities Code.  (§ 1720, subd. (a)(7)(A).)

"Tree removal work done in the execution of a project under [section 1720(a)(1)]."  (§ 1720, subd. (a)(8).)

Every one of these categories – except, under the majority's interpretation, section 1720(a)(2) – involves work that directly affects physical facilities or improvements, i.e., infrastructure work.

## 2.    The Rules Governing Statutory Construction

The rules of statutory construction have been repeated many times.  "[W]e look first to the words of a statute, 'because they generally provide the most reliable indicator of legislative intent.' [Citation.]  We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation].  'In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " '  [Citation.]  We are also mindful of 'the general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose.' "
(*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529-530 (*Pineda*).)

## 3.    The Proper Construction of Section 1720(a)(2)

Plaintiffs contend, and the majority agrees, that "[w]ork done" for a sanitation district – section 1720(a)(2) – means that *all* work done for a sanitation district by a contractor's employees, regardless of the nature of the work performed,

4

constitutes a public works project covered by the prevailing wage law.  In reaching this conclusion, the majority discusses the structure of section 1720, the statutory language, the legislative history, the administrative opinions that have construed section 1720(a)(2), and existing case authority.

While I agree with some points the majority makes, I do not reach the same conclusion.  In the end, it seems to me the intent of the Legislature, as reflected in the "Public Works" chapter of the Labor Code, confines the definition of "public works" – whether "construction" or not – to work on the infrastructure that constitutes a "public works project[]."  Sorting recyclables in a facility owned by a sanitation district is not work that in any way affects the infrastructure itself, and accordingly is not covered by the prevailing wage law.

a.    **The structure of section 1720**

The majority begins by pointing out that section 1720(a) has eight separate categories of public works, several of which are not in any way construction work (maj. opn., *ante,* at p. 12).  An example of this is subdivision (a)(4), "[t]he laying of carpet done under a building lease-maintenance contract."  (Maj. opn., *ante,* at p. 13.)  I agree laying carpet is not construction – but it *is* plainly work that supports or affects a structure; it is installation of material in a physical facility.  All of the eight categories of public works – except (on its face) section 1720(a)(2) – have that in common:  they all involve work on or relating to buildings or other forms of physical infrastructure.  I find nothing in the structure of section 1720 that lends credence to the majority's belief that the Legislature intended something different in connection with section 1720(a)(2).

5

### b.    The statutory language

The majority finds it "[s]ignificant to this appeal," and "overlooked by both parties," that the section 1720 definition of "public works" applies to the Labor Code's entire chapter on "Public Works," and not just to the article on wages (§§ 1770-1784).  (Maj. opn., *ante,* at p. 14.)  I do not find that "significant," for this appeal or otherwise.

Certainly, our interpretation of "public works" in the case before us may be cited as precedential for the meaning of that term in any of the statutory provisions in the chapter on "public works."  The same is true of any case that has had or will have occasion to construe the term "public works" in any context.  But I do not see, and the majority has not identified, any particular implications flowing from that fact.  In general, when work is public work, it is subject *both* to the prevailing wage requirements *and* to any other rights or protections (workers compensation, anti-discrimination, and so on) that appear in the other articles of the public works chapter.  And when work is not public work, it is not subject to the prevailing wage or any of the other provisions.  This does not assist me in analyzing whether sorting recyclables in a facility owned by a sanitation district is public work subject to any of the provisions of the "Public Works" chapter of the Labor Code.

### c.    The legislative history

I agree, as I stated at the outset, that the prevailing wage law has been expanded in coverage since the 1930's and is no longer limited to "employees . . . working on construction projects."  (Maj. opn., *ante*, at p. 17; see pp. 15-17 & fn. 14.)  But that does not answer the question of what the Legislature meant

6

when it said "[w]ork done for . . . improvement districts" in section 1720(a)(2).

The majority relies heavily on the legislative history of the prevailing wage law, and principally upon a change made in 1937 from the original 1931 law. (Maj. opn., *ante*, at pp. 17-19.)

As the majority explains (maj. opn., *ante*, at p. 17), the prevailing wage law has its origin in a 1931 statute. Section 1720 appeared in 1937, with the enactment of the Labor Code. The 1931 statute used the word "construction" in the predecessor to section 1720(a)(2), stating that "*[c]onstruction* work done for irrigation, utility, reclamation, improvement and other districts, or other public agency, agencies, public officer or body . . . shall be held to be public works within the meaning of this act." (Stats. 1931, ch. 397, § 4, p. 911, italics added.)

In the 1937 statute, the Legislature omitted the word "construction" in section 1720, subdivision (b) (now section 1720(a)(2)). The majority concludes this omission was significant, and that the definition of "public works" in the 1937 Labor Code was *not* intended "to be a restatement of the definition as it had appeared in the 1931 prevailing wage law." (Maj. opn., *ante,* at p. 18.)

I am not persuaded that the legislative history described in the majority opinion supports the majority's conclusion, or indeed that it sheds *any* light on what the Legislature intended by the omission of the word "construction." The majority relies entirely on a note from the California Code Commission Office that proposed the 1937 Labor Code. The note explained that the "provisions common to all [the] definitions" of "public works" that had existed in the 1931 prevailing wage law and in four other statutes (including a statute prohibiting the employment of

7

aliens on public works) were placed in section 1720. (Maj. opn., *ante,* at p. 19.) I do not see how this tells us anything useful about what the Legislature intended in 1937 when the word "construction" was omitted from what is now section 1720(a)(2).[3]

In short, there is really no legislative history to enlighten us on the pertinent point. Perhaps that is why the Supreme Court said in 2012 that, "[w]hen the California Legislature established the Labor Code in 1937, it replaced the 1931 Public Wage Rate Act with a revised, *but substantively unchanged,* version of the same law." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555, italics added.) The majority discounts the Supreme Court's statement, because the case did not involve section 1720. (Maj. opn., *ante*, at fn. 15.) Of course that is true; cases are authority only for the points actually decided. Nonetheless, the statement appears in the court's introductory explanation of California's prevailing wage law. So, in the absence of any indication elsewhere that the Legislature understood the 1937 act was effecting a substantive change in the definition of "public works," I am inclined to believe the Supreme Court was right, and the

---

[3]   As the majority tells us, the 1931 statute prohibiting the employment of aliens on public works (declared unconstitutional decades later) did not use the word "construction." It simply provided that, for purposes of the alien employment prohibition, "[w]ork done for irrigation, utility, reclamation, improvement and other districts . . . shall be held to be 'public work' . . . ." (Stats. 1931, ch. 398, § 3, p. 914.) That same language was used in the 1937 version of section 1720(a)(2). (Maj. opn., *ante,* at p. 19 & fn. 16.) The significance the majority draws from this is lost on me.

1937 act was a "substantively unchanged[] version of the same law" (*ibid.*) – in all respects.

I certainly agree with the majority that "[w]ork done" on its face is broader than "construction" work. (Maj. opn., *ante*, at p. 19.) But I cannot agree that the Legislature meant to broaden the definition to "any" work or "all" work done for improvement districts. I do not believe that in 1937 – a mere six years after the original prevailing wage statute – the Legislature intended to selectively extend the protections of the "Public Works" chapter to any and all employees of those who enter contracts with improvement districts, thus treating them differently than employees of contractors providing services to all other agencies of the state and its political subdivisions. In my view, construing "[w]ork done for . . . improvement districts" to mean *any* work done, as opposed to work done relating to the infrastructure of the improvement district, would have been a radical change, for which I would expect to find a clear statement of legislative intent.

### d.    The administrative opinions and existing authorities

That brings me to the case precedents that might assist us in construing section 1720(a)(2). In my view, none of them tells us very much about how to construe that provision. But what they do say comports with my view that to be covered by prevailing wage requirements, work must affect physical infrastructure in one way or another.

I agree with the majority on two points.

First, I agree this court owes no particular deference to the administrative opinions of the Department of Industrial Relations. (Maj. opn., *ante,* at pp. 20-22.) At the end of the day,

9

" 'final responsibility for the interpretation of the law rests with the courts.' " (*Morris v. Williams* (1967) 67 Cal.2d 733, 748.) That is the case here.[4]

Second, as the majority points out (maj. opn., *ante,* at pp. 22-23), no court case has addressed the precise issue before us. And one case tells us that section 1720(a)(2) "may apply independently to cover some work for an improvement district not otherwise encompassed within [section 1720(a)(1)]'s

---

[4] That said, I do not fault the trial court for its reliance on the *Biosolids* case. (See *The Hauling of Biosolids from Orange County* (Apr. 21, 2006, Dept. of Industrial Relations, Pub. Works Case No. 2005-009) <https://www.dir.ca.gov/OPRL/coverage/year2006/2005-009.pdf>[as of Nov. 30, 2018].) Indeed, I agree with the director's statement that "[f]inding the reach of 1720(a)(2) to be unlimited in scope would be illogical and create prevailing wage obligations for any type of work performed under contract for a district regardless of the nature of that work." (*Id.* at p. 4.) And I do not agree with the majority (maj. opn., *ante,* at p. 21) that the department "reversed itself" in 2016, when the director stated that the work at issue in that case was "covered by section 1720(a)(2) because it is work done for a utility district." That was a different case with different work. The work in question was "inspection and maintenance of [the contractor's] water quality testing and analytical equipment," which was "permanently attached" as a fixture to a water district's waste water treatment facility. (*Public Works Contractor Registration Requirement for Maintenance Work* (Feb. 5, 2016, Dept. of Industrial Relations, Pub. Works Case No. 2015-016) pp. 3, 1, 4 <https://www.dir.ca.gov/OPRL/coverage/year2016/2015-016.pdf>[as of Nov. 30, 2018].) That was work on the infrastructure of the facility, and the director did not suggest that all work for a utility district, no matter its nature, was "public work."

enumerated categories."  (*Azusa Land Partners v. Department of Industrial Relations* (2010) 191 Cal.App.4th 1, 21 (*Azusa*).)  With that I agree, as I do with the majority's view that sections 1720(a)(1) and 1720(a)(2) have "equal dignity."  (Maj. opn., *ante,* at p. 23.)

But *Azusa* refers to "some" work – not "any" or "all" work.  I do not think *Azusa* can be stretched to indicate support for the broader proposition that any or all work done for an improvement district is public work.  On the contrary, *Azusa* specifically speaks of "infrastructure work."  *Azusa* says:  "Although the type of governmental entity for whom *the infrastructure work* may be performed under [section 1720(a)(2)] is more limited than the entities for whom work may be done under [section 1720(a)(1)], the range of tasks covered by [section 1720](a)(2) is broader."  (*Azusa, supra,* 191 Cal.App.4th at p. 20, italics added.)  I agree the range of tasks is broader, but it is not infinite.  I believe it is limited as the prevailing wage law has always been limited:  to work on or supporting or affecting infrastructure.

As *Azusa* states, the plaintiff there was "correct that . . . '[section 1720](a)(2) *must* be given meaning separate and apart from [section] 1720(a)(1).'  Nevertheless, the fact that **some infrastructure is encompassed by more than one subdivision** does not negate the viability of either one or the possibility that, in another case, **other improvements** would be considered public work under one provision, but not both."  (*Azusa, supra,* 191 Cal.App.4th at p. 22, italics in original, boldface added.)

In sum, I do not see any suggestion in *Azusa* that any and all work done for an improvement district constitutes "public works."  On the contrary, *Azusa* characterizes the "work" that

may be performed under section 1720(a)(2) as "infrastructure work" and says only that section 1720(a)(2) "may apply independently to cover *some* work" not otherwise encompassed in section 1720(a)(1).  (*Azusa, supra,* 191 Cal.App.4th at pp. 20, 21, italics added.)  It is apparent to me that the court's reference to "some work" was a reference to infrastructure work of some kind – not to any and all work done for an improvement district.

In the end, both the majority and I can pluck out specific language from *Azusa,* a complex case arising in a wholly different context,[5] or from other cases on other topics, to support one point or another.[6]  But I think one general point is important, and that

---

[5]     *Azusa* involved whether the proceeds of certain bonds, paid by an improvement district to a private developer for the construction of public improvements, were "public funds," and if so whether "all construction of public improvements required as a condition of regulatory approval [was] subject to prevailing wage law, including public infrastructure constructed at private expense."  (*Azusa, supra,* 191 Cal.App.4th at pp. 13-14, 22-23.)  *Azusa* addressed and rejected the developer's contention that, under section 1720(a)(2), the developer was subject to prevailing wage requirements only as to public improvement work actually performed for and paid for by the improvement district, and that section 1720(a)(1) was unnecessary to the analysis of whether the entire project was a public work.  (*Azusa,* at p. 19.)

[6]     Plaintiffs cite general statements from other cases that likewise do not advance their position that all work of any kind is covered by section 1720(a)(2).  They quote *Reclamation Dist. No. 684 v. Department of Industrial Relations* (2005) 125 Cal.App.4th 1000, where the court said the "general rule is that any work done for a reclamation district is 'public work' and that maintenance work is included."  (*Id.* at p. 1006.)  The court held that maintenance work done on a levee to protect an island

12

is where the *Azusa* court "reject[ed] [the plaintiff developer's] invitation to parse the language of subdivision (a)(2) in isolation, disregarding the other subdivisions of section 1720 and *the context of the overall statutory scheme to which it belongs*." (*Azusa, supra,* 191 Cal.App.4th at p. 22, italics added.)

It is the italicized point I find to be most pertinent to the resolution of this case. If viewed in complete isolation, one might conclude that "[w]ork done for . . . improvement districts" is, as plaintiffs contend and as the majority holds, unqualified and unlimited in scope. But controlling authorities on statutory construction do not permit us to read one provision of a statute in isolation from the others, and in isolation from "the context of the overall statutory scheme to which it belongs." (*Azusa, supra,* 191 Cal.App.4th at p. 22.) The Supreme Court directs us to

---

from flooding was a public works project subject to the prevailing wage law, and that the exception in section 1720(a)(2) – for the operation of an irrigation or drainage system – did not apply, because the levee operated to prevent flooding, not to irrigate or drain the land. (*Reclamation Dist.,* at pp. 1002, 1006.) Again, the work at issue was work on infrastructure, and the case does not support any broader proposition. The same is true of *Reliable Tree Experts v. Baker* (2011) 200 Cal.App.4th 785, 788, where the court held that the plaintiff's contract with the Department of Transportation for tree pruning and removal along state highways was subject to the prevailing wage law because it was maintenance work under section 1771. The case did not involve section 1720(a)(2). The court merely observed that the scope of the law was "not to be ascertained solely from the words of [section 1720(a)(1)]," and noted, citing *Azusa,* that "[i]n certain ways, the scope of subdivision (a)(2) is broader than that of subdivision (a)(1)." (*Reliable Tree Experts,* at p. 795 & fn. 8.)

13

construe the words of a statutory provision " ' " ' "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " ' " (*Pineda, supra,* 51 Cal.4th at p. 530; *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 ["all parts of a statute should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others"].)

Adhering to that directive, I cannot embrace a construction of section 1720(a)(2) that is untethered to the decades-long history during which prevailing wage requirements have been applied to various kinds of work involving or affecting physical facilities or infrastructure – but never, until now, to the routine operations that may be performed inside but not affecting those facilities. I see no evidence the Legislature intended that all work done for improvement districts, without limitation – unlike that for all other public agencies – was to be compensated at prevailing wage rates, and I can think of no reason justifying such an anomalous result.

GRIMES, J.

14